No. 37,748

STATE OF KANSAS ex rel. HAROLD R. FATZER, Attorney General of the State of Kansas, and HAROLD H. HARDING, County Attorney of Wyandotte County, Kansas, *Plaintiff*, v. THE CITY OF KANSAS CITY, KANSAS, a M u n i c i p a l Corporation; CLARK E. TUCKER, Mayor Commissioner; EDWARD W. BECKER, Commissioner of Finance, Health and Public Property; and FRANCIS W. BLAKE, Commissioner of Boulevards, Parks and Streets, *Defendants.*

(222 P. 2d 714)

Opinion filed October 7, 1950.

*Harold R. Fatzer,* attorney general, of Topeka, submitted the cause for the plaintiff, and *Charles Hobart,* of Topeka, assistant attorney general, Harold *H. Harding, of Kansas City,* county attorney of Wyandotte county, and *T. F. Railsback,* of Kansas City, special assistant to the attorney general for the purpose of this case, were with him on the briefs for the plaintiff.

*James H. Barnes,* deputy city attorney, and *Edw. M. Boddington,* both of Kansas City, argued the cause, and *Alton H. Skinner,* city attorney of Kansas City, was with them on the briefs for the defendant.

*Edw. M. Boddington, J. O. Emerson,* and *Edw. M. Boddington, Jr.,* all of Kansas City, were on the briefs for The Kansas City Industrial Protective Association, *amici curiae.*

*Donald H. Corson,* of Kansas City, and *LeRoy Bradfield,* of Bonner Springs, were on the briefs for Quindaro Township, *amici curiae.*

*Leonard O. Thomas,* of Kansas City, was on the briefs for rural high-school districts of Wyandotte county.

The opinion of the court was delivered by

HARVEY, C. J.: This is an original proceedings in quo warranto, brought by the state on the relation of the attorney general and the county attorney of Wyandotte county, which questions the validity of Ordinance No. 35,841 of the city of Kansas City, the county seat of Wyandotte county. By that ordinance the city undertook to enlarge the boundaries of the city so as to include about 960 acres of land, being a part of the about 2,300 acres of what is commonly referred to as the Fairfax Industrial District situated between the northeast boundary line of the city, as previously located, and the Missouri river, the center of which, at all points here involved, is the boundary line between the states of Kansas and Missouri. Plaintiff attached as an exhibit to the petition a map, conceded by defendant to be substantially correct, showing the Fairfax Industrial District, the near-by portions of the city to the south and west thereof, and the area sought to be annexed to the city by defendant's Ordinance No. 35,841. To visualize the situation more clearly we have prepared from this map, omitting nonessential details, a drawing which shows the relative location of the area attempted to be annexed to the city by its Ordinance No. 35,841 to Fairfax Industrial District and to the parts of the city adjoining it on the south and west, which drawing is as follows:

We need not detail the pleadings since the pertinent portions thereof are hereinafter fully considered and the questions raised therein are determined. After the pleadings were filed plaintiff filed a motion for the appointment of a commissioner. Considering this motion the court appointed the Honorable George Templar of Arkansas City, a member of the bar of this court, as its commissioner, with directions, and authority to hear the evidence and to make suggested findings of fact and conclusions of law and report them to the court. After an extended hearing in which the parties were permitted to present all pertinent evidence they desired, the commissioner made findings of fact and conclusions of law, and filed them with our clerk, as follows:

"FINDINGS OF FACT.

"1. The issues submitted for consideration in this cause have been joined upon plaintiff's petition, the defendant's answer, as amended, and the plaintiff's reply. The action is in the nature of Quo Warranto to determine the legality of Ordinance No. 35,841 adopted by the city of Kansas City for the purpose of annexing to the city approximately 962 acres of land near the city that was not included within the limits of the city before the annexation ordinance was adopted and published April 4, 1949.

"2. Exhibit 1, offered by the State, a copy of which is attached to both plaintiff's petition and defendant's answer, shows the city of Kansas City, the land annexed by Ordinance No. 35,841, and the landmarks and area surrounding the same. All parties agree that it correctly represents the area under consideration and that it is drawn on a scale of 1 inch equals 400 feet.

"3. The city of Kansas City is a municipal corporation with a population of 148,000. It is a city of the first class, located in Wyandotte County, the city limits of which were defined by Ordinance No. 32,457, before the passage and publication of Ordinance No. 35,841, the legality of which is now in question. That before the ordinance now questioned was enacted, the city was bounded on the north by the Fairfax Industrial District and the State of Missouri,

on the south by Johnson County, on the east by the Fairfax Industrial District and the State of Missouri, and on the west by rural Wyandotte County.

"4. The Fairfax Industrial District consists of approximately 2,300 acres of land formerly owned by the Kansas City Industrial Land Company, which company sold tracts to various persons and corporations, including tracts of about 925 acres in the northeast portion of the district to the city of Kansas City for a municipal airport, now known as Fairfax airport.

"5. Prior to 1923, most of what is now the Fairfax Industrial District was waste and swampy land, the ground near the river was higher than that near the city limits, and in time of floods or heavy rainfall the district was frequently inundated. For its proper development as an industrial site, the area required drainage and dikes to protect it from floods. Those interested in the development of the area formed the Fairfax Drainage District, commenced work on a drainage ditch, got into litigation with the city when an attempt was made to extend the ditch across city property. This litigation was eventually compromised, a closed sewer was constructed by the Drainage District, the city paid 26/46ths of the cost and the Drainage District paid the remaining 20/46ths of the cost. Both the city and the occupants of the Fairfax Industrial District use the sewer. The sewer lies outside the city limits and is under possession, control and supervision of the officials of the sewer district. Its existence and maintenance is necessary and essential to the development of the Industrial District.

"6. For the purpose of furnishing flood protection to the Fairfax Industrial District and to protect the city's municipally owned water and light plant and the city owned 'Kansas City Public Levees,' the city of Kansas City and the Fairfax Industrial District sponsored a project in which the United States Government constructed flood protection levees and walls around the Fairfax District, including three pump houses to pump water accumulating in Fairfax District over the dikes during times of high water. Two of the pumps are located on the city owned airport. The United States Government paid for most of the cost of this project. These dikes are improvements required and necessary to keep high water of the Missouri river from flooding the area described as the Fairfax Industrial District.

"7. Prior to and at the time of the passage of City Ordinance No. 35,841, which is the ordinance in controversy in this case, the boundaries of the Fairfax Industrial District, contiguous to and touching the city of Kansas City, Kansas, are shown by the green line on the map attached to plaintiff's petition and defendant's answer, and also shown on Exhibit 1. The green line shown on the map begins at the letter 'U' in the word 'Missouri' in the center of the Missouri river, runs west on the second standard parallel to a point on the map marked 'A' thence northerly and northwesterly to a point on the map marked 'B,' and thence northerly, westerly and northerly to the letter 'C' on the map, which is a point on the Missouri river. The boundary of the Fairfax Industrial District, touching the State of Missouri, starts at the letter 'C,' thence northerly to the Missouri-Kansas state line in the center of the Missouri river, and runs along said state line in an easterly and southerly direction to the letter 'U' in the word 'Missouri' in the center of the Missouri river, where the second standard parallel intersects the state line, the point of beginning (Exhibit 1). The south and west boundary of the Fairfax Industrial District is the city

limits of the city of Kansas City, Kansas; and the north and east boundary of the Fairfax Industrial District is the State of Missouri (Exhibit 31). The district does not touch upon, nor is it adjacent to any other city, township, or political subdivision of the State of Kansas, except the city of Kansas City (Exhibit 31).

"8. The land by said Ordinance No. 35,841, added and made a part of the city of Kansas City, was described therein as follows:

" 'The parts of Sections 26, 27, 34 and 35, Township 10 South, Range 25 East, in Wyandotte County, Kansas, included in the following descriptions:

" 'Beginning at a point where the easterly line of Fairfax Road is intersected by the Second Standard Parallel South, in Wyandotte County, Kansas; thence northwesterly and northerly along said easterly line of Fairfax Road to the south line of Sunshine Road; thence east to the easterly line of Donovan Road along the south line of Sunshine Road; thence northeasterly along the easterly line of Donovan Road to the Southerly line of Donovan Road; thence southeasterly along said southerly line of Donovan Road, and the extension of said southerly line of Donovan Road to the center line of the Missouri River; thence northeasterly, northerly, northwesterly, westerly and southwesterly along the center line of the Missouri River to a point on the extension of the east line of Fairfax Road, said point being Five Hundred Fifty-six (556.00) feet east, at right angles of the north and south center line of Section 27, Township 10, South, Range 25 East; thence south of a point on the extension of the east line of Fairfax Road, said point being One Thousand Eight Hundred Thirty-eight and Twenty-eight One-Hundreds (1,838.28) feet, more or less, north at right angles, from the east and west center line of Section 27, Township 10 South, Range 25 East; thence south Thirty-five degrees and Twenty-seven minutes (35° 27') East Four Hundred Eighty-two and Seventy-eight One-hundredths (482.78) feet, more or less to a point; thence south Seven Hundred Seventy and One-One-hundredth (770.01) feet, more or less, on a straight line, parallel with the north and south center line of said Section 27; thence West Three Hundred Sixty-nine and Seventy-nine One-Hundredths (369.79) feet, more or less, on a straight line, parallel with the east and west center line of said Section 27, to the west line of Fairfax Road; thence south and southeasterly along the westerly line of Fairfax Road to the Second Standard Parallel South, in Wyandotte County, Kansas; thence east along the Second Standard Parallel to point of beginning.'

"The tract of land described in said ordinance was the same as the area shaded in pink and shown on Exhibit 1 introduced in evidence, and outlined in red on the map attached to the plaintiff's petition marked Exhibit B. That the portion of Sunshine Road referred to in the ordinance is now known and referred to in this case as a portion of Donovan Road.

"9. The city of Kansas City maintains a Junior College, seven High and Junior High Schools and forty Elementary Schools. Students residing in the Fairfax Industrial District area now attend the Kansas City public schools. The Board of Education of Kansas City does not collect any tuition from the District for students. It appears that there are no students actually residing in the part of the Fairfax Industrial District annexed by Ordinance No. 35,841. Until 1929, all the land in the Fairfax Industrial area was in and a part of the Kansas City School District. Thereafter, by statute, the area was detached

from the Kansas City School District. The area detached was organized into an Elementary school district No. 46 q. This district never built or maintained a school and pays for transporting students only. School taxes in District 46 q are very low, paying in 1949 only .0211 per $100.00 valuation for Elementary school tax plus .54 per $100.00 valuation for County High School tax. The privately owned property in the area annexed by Ordinance No. 35,841 will pay a much higher levy for educational purposes after annexation.

"10. The Fairfax Industrial District is an urban area and not a farming area. The district consists of, and is developed for, manufacturing plants, assembly plants, warehouse and wholesaler's outlets, and other type of businesses requiring large substantial buildings and railroad facilities. Among the provisions stated in the warranty deeds issued by the Kansas City Industrial Land Company to industries located in the district was the following:

" 'Said premises shall not be used or occupied at any time for the purpose other than for the purposes of the business of manufacturing, wholesaling, jobbing, warehousing, or business of a kindred nature of the convenient and economical conduct of which adjacent railroad trackage facilities are ordinarily required.'

"11. On June 2, 1925, a plat and an accompanying description record of the plat was filed by the representatives of the Kansas City Industrial Land Company (See Exhibit 80). The plat included much of what is now the Fairfax Industrial area and all of the land annexed by Ordinance No. 35,841. The plat was not signed by all the landowners holding title to property covered by plat. It was approved by the City Engineer of Kansas City. It was also approved by the City Planning Commission and by the Board of City Commissioners of Kansas City on May 26, 1925, before filing. It recites that 'The Kansas City Industrial Land Company does not dedicate for public use any streets, alleys or public highways, except as indicated on this plat.' Descriptions of various tracts owned by persons in the Fairfax District contains these words 'less strip dedicated for road,' and the area of the road is subtracted from the land to which tract owner holds record title.

"The description record accompanying the plat (Exhibit 80) recites that it is 'filed with the Register of Deeds of Wyandotte County, Kansas, for the purpose of facilitating description and acreage for taxation purposes.'

"12. At the time of the preparation of the Fairfax plat (Exhibit 80) on April 1, 1925, the area platted outside the city limits consisted of 1,373.07 acres owned as follows: The Kansas City Industrial Land Company owned 1,122.85 acres; the Union Pacific Railroad Company owned 32.80 acres; eight private owners owned 72.18 acres; two railroads other than the Union Pacific owned 66.47 acres; land set aside for dedicated roads was 31.54 acres; land on which dikes were built was 57.23 acres. Since 1925, by accretions and the addition of Goose Island, 900 acres were added, 700 acres of which are part of the city's airport (T. 523), making a total acreage area at this time of about 2,300 acres.

"13. Long prior to the passage of Ordinance No. 35,841, there were two townsites platted within the area of the entire Faifax Industrial District, and there was another referred to as Reichenecher's Subdivision. The record does nct disclose with accuracy whether any one of these was within the area de-

scribed in Ordinance No. 35,841. A plat with description of properties and other data was filed in the office of the Register of Deeds by the Kansas City Industrial Land Company June 2, 1925 (Exhibit 80), being recorded in Plat Book 17 at page 44, and the description of the lands and other data is recorded in the Register of Deed's office in Record 713 at page 360; in that description where it refers to the plat which had been filed, it was stated: 'This plat includes tracts heretofore surveyed and platted as Fairfax and Clarksdale Additions and Reichenecher's Subdivision, which are hereby vacated and included in the plat of Fairfax Industrial District.' What was spoken of as Reichenecher's Subdivision was not a townsite at all, but was a plat of a farm which was partitioned in kind by an action in the District Court to divers and sundry tenants in common, and had none of the aspects of a platting into lots and blocks. A map of the partition, marked exhibit 69 (Plaintiff's), was introduced in evidence. No plat of the Reichenecher's estate or of the partition of it, was ever filed in the office of the Register of Deeds. The town sites of Clarksdale and Fairfax, if not sufficiently vacated by the plat and descriptive matter referred to above, were actually vacated by an order of the Board of County Commissioners of Wyandotte County on the 7th day of May, 1928, a photostatic copy of such order being introduced in evidence as Exhibit 59, and they appear in Commissioner's Journal 778, page 419.

"14. The land involved in the annexation ordinance consists of the municipal airport owned by Kansas City, 925.8 acres; Property owned by United States Government, 2 acres; Privately owned land 11.691 acres; Donovan Road owned by Kansas City, 3.2 acres; Roads opened by petition and view 13.1 acres; Roads dedicated by easement deed 6.2 acres; None of the annexed land, whether owned privately or by city or United States Government, and none of the highways, whether owned by the city, whether dedicated or opened by petition and view, was within the city of Kansas City before Ordinance No. 35,841 was adopted.

"The area described in the annexation ordinance is the area colored pink on Exhibit 1 and generally referred to during the hearing as 'the pink area.'

"15. The perimeter of the Fairfax Industrial area measured along the city limits and the state line, which is the center of the Missouri river and includes approximately half of the Missouri river for the distance it borders the Fairfax Industrial District, is 40,790 feet. That the common boundary of the district and the city of Kansas City is 16,040 feet. That the distance of the state line is 24,650 feet. However, of the portion of the district actually annexed by Ordinance No. 35,841, only 82 feet touches the city limits of Kansas City, as it existed before the adoption of the annexation ordinance. This 82 feet is the width of the road, described as 'Fairfax Road' where it touched the boundary of Kansas City at the Second Standard Parallel South (See Exhibit 1). At no other place does the boundary of the annexed area touch any boundary of the city of Kansas City as described in Ordinance No. 32,457, which ordinance defined the boundaries of the city before adoption of Ordinance No. 35,841, and which Ordinance No. 32,457 was repealed by the later Ordinance No. 35,841.

"16. A part of the Fairfax Industrial District has been subdivided into such lots and blocks as accommodated the needs of industrial purchasers of

space in the area. Other portions of the area are being so subdivided as purchasers appear and indicate the amount and location of space that best suits the needs of the individual concern. The spaces deeded to the respective purchasers have been in each instance described by metes and bounds. Roads or streets surround the tracts deeded so that convenient ingress and egress is afforded each tract and its occupants. There is an apparent uniformity observed in the shape and pattern of the tracts disposed of to purchasers, and streets and roads laid out and opened to public travel do conform, as nearly as the contour of the land will permit, to established roads and streets in the city of Kansas City. The lots or blocks appearing on the plat filed (Exhibit 80) by the Kansas City Industrial Land Company were not described or designated by the Company by any letter or number. The numbers assigned to such lots or tracts were placed on the copy of the plat (Exhibit 70) by the County Clerk's office to identify the tracts on the tax rolls.

"Ordinance No. 35,841 did not describe any platted lands annexed by giving the name of the addition or subdivision as platted.

"17. In subdividing the Fairfax Industrial District, the proprietor of the district, the Kansas City Industrial Land Company, has the exclusive right to determine the size of the lots or blocks or tracts so subdivided, and has been continuously, since the development of the district began, subdividing the district into such lots, blocks or tracts as the purchaser of such lots required for industries located thereon. This process of subdivision has been carried on in such a way that new roads or streets are laid out by the proprietor of the district to carry out a uniform pattern of roads and cross roads for the accommodation of the occupants and the public. These roadways or streets surround the parts of the area subdivided and are so arranged as to give easy access to all the plants and businesses located in the area and to provide ways for quick transportation to the city and to offices and other industrial areas located in the adjoining communities.

"18. The Fairfax Industrial area has surfaced roads or streets, it has sewers, water mains, there are many electric and electric power lines throughout the district, there are substantial dikes around the portion of the area bordering the Missouri river. These public improvements were made with the assistance or under the sponsorship of the city of Kansas City or the County of Wyandotte, the Fairfax Drainage District and the Kansas City Industrial Land Company. The development was, in each instance, planned and carried out with the purpose of mutually aiding the participants and the citizens of the community. The light and power lines and the water mains were installed by or under supervision of city of Kansas City and it was intended by the city to obtain sufficient customers in the Fairfax area and to charge them a sufficient price for power and water to amortize any expense of installation and to pay cost of maintenance, production, deterioration and replacement. The increased demands made on the water and electric power facilities of the city by the concerns doing business in the Industrial District have required substantial expansion and enlargement of both the water and electric power facilities of the city.

"19. Since the establishment of the Fairfax district, the Fire Department of Kansas City has furnished fire protection to the occupants of the district,

and arrangements now provide for the call of the Kansas City Fire Department by automatic alarm or telephone. That large water mains have been installed with fire hydrants in the district for purpose of making available effective fire protection. The city receives hydrant rental for water mains and hydrants. While each industrial plant has its own fire fighting equipment and fire crews and supplemental water supplies, also chemicals, the city has answered a number of calls to the district and a few to industrial plants in the district, and stands ready at all times to respond to any call made by any person or concern in the district for fire fighting or proctection in that area. The expense of this service is borne by the city.

"20. Since the development of the Fairfax District began, City Police cars have regularly patroled the district. A part of this work is now carried on so that the city's property on the airport may be properly policed and the Police had no jurisdiction or authority in the area before the annexation except at the airport. On several occasions the City Police have answered calls to the district and have effectively aided in expediting and directing the flow of congested traffic in and out of the district. The City Police Department is available at all times to persons and concerns in the district for the protection of persons and property and for the preservation of the peace.

"21. The roads connecting with roads leading out of Fairfax Industrial District connect with and are a continuation of the public streets within the city of Kansas City and the roads and streets maintained by the city give the only access to the roads and streets in the district.

"22. The city of Kansas City owns and operates the Fairfax Airport at the northeast corner of the Fairfax Industrial District. It is a well equipped modern airport. There are 13 buildings located on it, part of the buildings are wood construction. The buildings and appurtenances on the airport are of great value and the business carried on in the buildings of great importance. The city has the statutory right and authority to operate this airport and protect the property there. It has the right and duty to furnish Police and Fire protection to the airport area. Public roads and streets are open and available from the city proper to the airport. The representatives of the city, including Police and Fire Departments, do not have control over all the roadways, but have the right with the public at large to use these public facilities for traveling to and from the airport to the city proper. These roads are congested with traffic before and after work hours. City police officers direct the traffic on the roadways for the convenience and benefit of all persons going to and coming from places of business in the district. All the expense of this police service is paid by the city.

"23. The proceedings before the Board of City Commissioners in the passage of Resolution No. 13,044 and Ordinance No. 35,841 were regular, complied with the statues applicable as to procedure, and the City Clerk notified the County Clerk and the County Superintendent of Schools, of the City's intent to pass the annexation ordinance more than 10 days before its passage, and the notice accurately described the property sought to be annexed in metes and bounds. The regularity of the proceedings is not challenged if the same are authorized by the statute applicable.

"24. The airport statute, being Article 1, Chapter 3 of the 1947 Supp. to

G. S., 1935, gives the city the same jurisdiction and police power over its airport, even though the airport is located outside the city limits, as it has over any part of the city located within the city limits. That the city has owned the airport since 1940 and has since that time had sole, exclusive jurisdiction and authority over the airport and has by its own acts and through leases with the United States Government greatly and substantially improved the airport, provided it with all utilities, exercising police protection and fire protection, and providing personnel for the management of the port, all under right and authority of law.

"25. The statutes under which the annexation proceedings were undertaken by the city of Kansas City, in adopting Resolution No. 13,044 and Ordinance No. 35,841, were Sections 13-1602 and 13-1602a of the General Statutes of 1935, which statutes provide for the annexation of land by cities of the first class having a commission form of Government and the statutes referred to had not been repealed and were in full force and effect.

"26. The Fairfax Industrial District lies between the Missouri state line, which is the center of the Missouri river and which forms generally the east and north boundaries of the district on the one hand, and the city of Kansas City, which forms roughly the west and south boundaries of the district on the other. The entire boundary of the district is approximately 40,790 feet, of which about 16,040 feet or about 40% of the total coincides with the city boundary. However, not all of the Fairfax Industrial District was annexed by Ordinance No. 35,841, but only the portion colored in pink on Exhibit 1. The total boundary, or the perimeter of this tract is 33,410 feet. The length of the western boundary is 11,550 feet, the length of its river side is 11,820 feet, this does not touch the city, and the remaining boundary is 10,040 feet. Of this remaining 10,040 feet should be subtracted 2,680 feet (the east side of Fairfax Road), 2,106.6 feet more (the east side of the north-south portion of Donovan road), leaving as the total southern boundary of the annexed tract a distance of 5,253.4 feet of which only 82 feet touches the boundary line of Kansas City. The 82 feet of roadway cannot be considered as one side of the annexed tract. It is only the end of a stem consisting of a roadway that extends from Donovan road, south a distance of 2,680 feet (about one-half mile) to the boundary line of the city of Kansas City. This one-half mile of roadway is designated as Fairfax road, it is 80 feet wide and no part of it is platted into lots, blocks or tracts. Donovan Road, located on Exhibit 1 and identified in the testimony as such, is actually the southern boundary of the tract sought to be annexed and no part of it touches the city boundary. That at no place did two-thirds of any line of its boundary lie upon or touch the boundary line of Kansas City; that the portion of the Fairfax Industrial District sought to be annexed is not within, or mainly within the city; that the territory added to the city by the annexation ordinance does not make the boundary line of the city straight or harmonious, but on the contrary creates a tract which on the map (Exhibit 80) resembles a large, lopsided mushroom resting its stem on the edge of the city's boundary.

"27. The description of land in Ordinance No. 35,841 carries the lines to the center of the Missouri river, i. e., to the Missouri-Kansas state boundary. Within the area described in the ordinance, the city owned by purchase the Fairfax airport of 925.785 acres; also included in the area was private property,

exclusive of County roads, totalling 11,691 acres, also 2 acres owned by the United States Government; there was likewise included a total area of 22.524 acres of private, City owned, dedicated and County easement roads.

"28. Sometime in May or June, 1923, a so-called 'gentlemen's agreement' was made between the then officials of Kansas City and authorized representatives of the Kansas City Industrial Land Company, by the terms of which the city officials agreed that the city would not annex or include any lands of the Fairfax Industrial District within the corporate limits of the city for a period of 10 years.

"Conclusions of Law

"1. The city of Kansas City adopted Ordinance No. 35,841 for the purpose of annexing 962 acres of land near the city. This ordinance repealed Ordinance No. 32,457 which defined the boundaries of the city on April 2, 1949, the date of the enactment of Ordinance No. 35,841, generally referred to by the parties as the 'annexation ordinance' for the purposes of this case.

"2. The city, in passing the annexation ordinance, acted under the authority of G. S. 13-1602 and G. S. 13-1602a, which statutes are, except for two minor parts not herein pertinent or applicable, identical in context. G. S. 13-1602 reads as follows:

" 'Annexation of adjacent territory, exception; duties of city clerk; land outside county, procedure. Whenever any land adjoining or touching the limits of any city has been subdivided into blocks and lots, or whenever any unplatted piece of land lies within (or mainly within) any city, or any tract not exceeding twenty acres is so situated that two-thirds of any line or boundary thereof lies upon or touches the boundary line of such city, said lands, platted or unplatted, may be added to, taken into and made a part of such city by ordinance duly passed. Said ordinance shall describe the platted lands by giving the name of the addition or subdivision as platted, and by giving the metes and bounds of the unplatted lands, with the section, township, range and county in which the same are located. In adding territory to any city, if it shall become necessary, for the purpose of making the boundary line straight or harmonious, a portion of a piece of land may be taken into such city, so long as such portion of the piece taken in does not exceed twenty acres: *Provided,* That lands owned by any person, association or company not exceeding twenty (20) acres in extent, and upon a portion of which a hospital is being maintained, shall not be annexed for any purpose without the consent of the owners of such land: *Provided further,* That before the governing body of any such city shall approve such ordinance the city clerk shall notify the county clerk and the county superintendent in writing at least ten days before approval of said ordinance of the property to be taken into such city, describing said property accurately by metes and bounds: *Provided further, however,* That no such land lying outside of the county in which such city or a part thereof is located may be added to or taken into such city unless petitioned therefor, or consented thereto, in writing, by the owners of a majority of the acres of land, and also by a majority of the resident landowners in the tract or parcel of land proposed to be so annexed or added to such city (L. 1927, ch. 118, sec. 1; L. 1931, ch. 120, sec. 1; L. 1933, ch. 128, sec. 1; March 3).'

"3. The proceedings of the city at the time of passage of the annexation

ordinance were in all respects in compliance with the statutes under which the city purported to act, i. e., G. S. 13-1602 and 13-1602a.

"4. The Fairfax Industrial District, a portion of which was annexed by the ordinance, was located and developed to its present position because of its nearness to Kansas City, which offered the district and the industrial institutions located there the advantages necessary to insure the success of such a development, namely, a large population with sufficient supply of labor, good educational facilities, convenient location to transportation, business centers, light, power and water in abundance, roads, streets and street car services, with dikes for flood control and sewers for drainage and sanitation. The Industrial District is an urban industrial area and is in no sense a farming area. Those developing the district, by restrictive covenants in deeds to purchasers, restricted use of land to industrial purposes and intended it to become and caused it to become an urban industrial area. It is not in any sense a residential district or area.

"5. The State of Kansas, plaintiff here, challenges the validity of the annexation ordinance and claims that the statute does not authorize the city to adopt such an ordinance of annexation for the following reasons:

"(a) Tract was not at time of enactment and is not now subdivided into blocks and lots.

"(b) The tract is unplatted land and did not at the time of the enactment of the ordinance lie within or mainly within the city.

"(c) The tract exceeds 20 acres in area and in fact exceeds 900 acres in area.

"(d) The said tract is not so situated that two-thirds of any line or boundary thereof lies upon or touches the boundary line of the city.

"(e) Included in the area described in Section 1 of said ordinance is a narrow corridor 80 feet in width extending northward from the city limits for a distance of 2,678 feet, said corridor being a regularly established county road known as Fairfax road, and which is used and suitable for use only as a public highway. The tract described in Section 1 of the ordinance is not so situated that two-thirds of any line or boundary thereof lies upon or touches the boundary line of the city, the 80 feet width of said public highway known has Fairfax road being the only point of contact with the city boundary.

"(f) Included in said tract are portions or pieces of land, the inclusion of which portions in added territory is not necessary for the purpose of making the boundary lines of the city straight or harmonious.

"While there is some indication that the city relies generally in sustaining its action on the part of G. S. 13-1602, which provides that 'whenever any unplatted piece of land lies within (or mainly within) any city . . . (it) may be added to, taken into, or made a part of the city by ordinance duly passed,' these findings will cover all the issues raised by the pleadings:

"(a) The first challenge of invalidity raised by the plaintiff is that the tract annexed was not, at the time of adopting the ordinance, subdivided into lots and blocks. It appears that of the 960 acres sought to be annexed, over 900 acres of it consisted of an airport obviously unplatted, more than 15 acres of roadways that were not even in a subdivided area, and that about 11 acres of the whole tract was privately owned and subdivided into tracts for

the benefit of the respective private owners. The subdivision of this small area would not justify the annexation of an acrea over eighty and one-half times its size on the basis that said annexed tract had been subdivided into lots and blocks. The statute contemplates that all or substantially all of the area annexed be capable of subdivision into lots and blocks. Under this provision it is necessary that the piece of land be subdivided into lots and blocks, and no exception is made to cover the circumstances and conditions of this case where only a small fraction of the area annexed is subdivided.

"(b) The next challenge of the plaintiff is that the tract is unplatted land and did not, when the ordinance was adopted, lie within or mainly within the city. An examination of Exhibit 1 best illustrates that this challenge must be sustained. The entire Fairfax Industrial District does not lie within or mainly within the city, nor does the portion of the district sought to be annexed lie within or mainly within the city.

"The ordinance does not seek to annex the entire area, but only a smaller part shown in the color pink on the map (Exhibit 1). All of this area lies east and north of the city. On the map the distance from line B-C (the east boundary of Kansas City) east to the west line of the tract annexed is 17½ inches, which means on the ground it is a distance of 7,000 feet (17½×400 feet, the scale of the map being 1 inch to 400 feet). The distance from the point 'A' on the map to the west line of Fairfax road is 1 inch, or 400 feet, and this is the only point at which the annexed tract touches the city at all, and then for a distance of only 82 feet. The city claims that because most of the boundary of the Fairfax Industrial District consists of the Missouri-Kansas state line, it will be impossible for the city to ever surround the Fairfax District to a greater extent than it now does and that therefore the proprietors of the district could always prevent annexation because of the peculiar geographic condition. This may be true, but the statute under which the annexation was undertaken made no exceptions in circumstances where state lines were involved, the statute did make some provisions where county lines were involved and required consent in writing of resident landowners before the city could annex areas across a county line from a city. Less than 40% of the perimeter of the Fairfax Industrial District is common with the boundary of the city. Less than 1% of the perimeter of the area annexed lies along or touches the boundary of the city, the length of the perimeter being 33,410 feet.

"(c) The next claim of the plaintiff is that 'the tract exceeds 20 acres in area and in fact exceeds 900 acres in area.' The claim is true. Without laboring the question raised as to roads and the title to the same, it is obvious that the tract annexed exceeds 20 acres in area. There is no claim that it does not. The city seeks to deduct from the annexed area the amount of acreage in the airport, 925.8 acres, the area of the roads, 16.3 acres, that owned by the United States Government, 2 acres, leaving 17.891 acres of privately owned land including private roadways. The statute does not authorize this deduction. All the area annexed was outside the city limits as defined by Ordinance No. 32,457 before the annexation ordinance was passed. All of it, the airport, roadways and privately owned tracts, taken together, exceed

960 acres in area and cannot be annexed under the provisions of the statute permitting annexation of tracts not exceeding 20 acres in area.

"(d) The plaintiff's next claim is the tract annexed is not so situated that two-thirds of any line of boundary thereof lies upon or touches the boundary line of the city. This claim must also be sustained. At no place, save and except the 82 foot roadway at the point 400 feet east of letter 'A' on Exhibit 1, does the boundary of the area sought to be annexed lie upon or touch the boundary line of the city. The city's claim that the end of Fairfax road, 82 feet in width, is a line of the annexed area and that it lies completely on the boundary line of the city cannot be sustained. Since the area annexed exceeds 20 acres, it makes little difference, but the 82 feet of roadway represents only one end of a one-half mile stem connecting the annexed area with the city. It is not truly a line of the area annexed. The south line of the area annexed is actually the road designated on the map (Exhibit 1) as 'Donovan Road' and which runs along the south side of the pink colored area on the map and is over one-half mile from the city's boundary.

"(e) The foregoing conclusion (d) is decisive of the plaintiff's next claim, namely, that the tract annexed is not so situated that two-thirds of any line or boundary thereof lies upon or touches the boundary line of the city since the 80 foot width of the public highway known as Fairfax road is the only point of contact with the city boundary. From this point it is approximately one-half mile to the edge of the tract sought to be annexed. The end of a roadway 80 feet in width and one-half mile in length could not be considered a line or a boundary of the annexed area.

"(f) The plaintiff claims that the portion and pieces of land included in the territory annexed are not so annexed for the purpose of making the boundary lines of the city straight or harmonious. This claim must also be sustained. Exhibit 1 reveals that far from making the boundary line of the city straight and harmonious, a huge mushroomed shaped tract mounted on a half-mile long stem 80 feet wide, the end of which is the only point of its entire perimeter touching the original city boundary, has actually been created and annexed by the ordinance. Furthermore, the area includes a much greater acreage than the permissible 20 acres mentioned in the statute. The fact that nearly all of this acreage is already owned by the city does not alter the fact that not more than 20 acres may be taken under this part of the statute. No distinction is made by the statute permitting city owned land or roadways to be deducted in making computation to determine the acreage of the tract annexed.

"6. The proprietors of the Fairfax Industrial District and the owners of the industrial establishments there have received great benefits from the city of Kansas City. In addition to the advantage of the geographic and commercial location, the district has the benefit of and the protection from the Police Department and the Fire Department of the city, the water mains and electric power lines, together with sewers and dikes developed in conjunction with the city, the roadways and streets of the district connect with the roads and streets of the city and make the district easily accessible to those who are solicited to work and trade there. All these things essentially aided and make possible the success of the Fairfax Industrial District. The record of

this case is replete with evidence of the great amount of aid and assistance and consideration that has been given by the city and its officers to the development of the district. The water works system is vital to the health and well being of all employees and persons in the district, and the electric power is essential to its industrial activity. Schools are a necessary part of any center of population and are entitled to be maintained by all those who get benefits from a close location to an organized community. A city must be expected to grow, and as it grows, the industrial part of the community may be expected to benefit from the growth and increase. Each business and each individual in a community should contribute to sustain it. A stronger case for annexation of the entire Fairfax Industrial area to the city of Kansas City could hardly be made out under the general annexation statute, Art. 5, Chapter 12, General Statutes of 1935.

"Under the facts and conclusions set forth, it is the opinion of the Commissioner that as a matter of law, the plaintiff has proved by the preponderance of all the evidence offered that Ordinance No. 35,841 of the city of Kansas City is not valid because the statute under which it was adopted does not give the right of annexation to the extent attempted to be exercised by the city in the ordinance, and the prayer of plaintiff's petition should be sustained, and the Commissioner concludes, as a matter of law, that neither the defendant city, nor its officers, had legal authority, under G. S. 1935, Secs. 13-1602 and 13-1602a, to annex the land described in its ordinance to the city of Kansas City and to have the same made a part of the city, and the city and its officers should be ousted of all authority and of all governmental control over said land."

Following the announcement of the commissioner's report defendant filed a motion for judgment on the findings of fact, exceptions to the commissioner's findings of fact and conclusions of law, and a motion to modify the same in various particulars, and for additional findings, and also filed a motion for a new trial. The commissioner had a hearing on these motions, considered them and overruled them.

The commissioner filed his report with this court, together with exhibits introduced before him, and a transcript of the oral testimony. Whereupon, defendant refiled the motions which had been filed before the commissioner and plaintiff filed a motion for this court to approve the report of the commissioner and to render judgment for plaintiff thereon. The case was regularly set for hearing in this court and was heard upon the briefs and oral arguments of the parties.

In this court plaintiff points out that the question before the court is the authority of the city to extend its boundaries so as to include the real property sought to be included by the ordinance in question, and that the case does not involve the authority of the

city to include within its boundaries any other adjacent property. We concur in that view. Plaintiff argues that the property sought to be taken into the city by the ordinance in question is not so situated and of such character as the city is authorized by statute to take into or annex to the city by ordinance, and discusses the various subdivisions of our statute (G. S. 1935, 13-1602). Upon this point we are in general accord with the analysis made of the statute and of the ordinance in question as it relates to the statute in our commissioner's fifth conclusion of law.

It is first argued on behalf of defendant that the court should deny in its discretion the writ of quo warranto on the ground of its being inequitable and unjust. It is true the court has a measure of discretion in quo warranto proceedings. (See, *State, ex rel., v. Allen County Comm'rs,* 143 Kan. 898, 57 P. 2d 450, syl. 3, and the cases collected at page 902; also, *Gas Service Co. v. Consolidated Gas Utilities Corp.,* 145 Kan. 423, 65 P. 2d 584; *State, ex rel., v. Grenola Rural High School Dist.,* 157 Kan. 614, 142 P. 2d 695, and cases collected in the American Digest System, Quo Warranto, Key No. 6.) This is a judicial discretion. It is not to be used without reason and does not authorize a court to ignore a valid applicable statute which has been promptly invoked.

It is next argued that annexation statutes should be liberally construed in favor of the city's power. We are in general agreement with this thought, but perhaps it would be more accurately stated that an ordinance of a city, like a statute of the legislature, is presumed to be valid. This, of course, does not prevent a judicial inquiry into its validity.

Defendant next argues that Fairfax Industrial District is a proper subject of annexation and that it lies within or mostly within the city. The contention is not important here. The ordinance in question did not attempt to annex Fairfax Industrial District to the city. It attempted to annex only a part of Fairfax Industrial District, the part specifically described in the ordinance. While there was much evidence received by our commissioner pertaining to the Fairfax Industrial District as a whole its only purpose was to show the general situation and the history of the development of the district. These are the only purposes for which such evidence can be considered here. We must necessarily limit our decision to the authority of the city to annex the particular property described in the ordinance, in view of our statute (G. S. 1935, 13-1602) under which the city acted.

Defendant argues the city may annex one part of the area under one provision of G. S. 1935, 13-1602, and another under another provision of the same law by one ordinance. The point is well taken. This court so ruled in *State, ex rel., v. Kansas City*, 122 Kan. 311, at pages 322 and 323, 252 Pac. 714, but we do not see the applicability of this principle of law in this case.

Defendant argues the Fairfax airport, containing 925 acres, was by G. S. 1947 Supp. 3-123, fully made a part of the city before the ordinance in question was passed. The point is not well taken. The statute reads as follows:

"All such municipalities so operating airports or municipal aviation fields jointly are hereby granted the same rights, privileges and immunities, and are charged with the same obligations, responsibilities and duties toward such airports and flying fields located outside of the municipal limits of any municipality as now exist for any property now located within the limits of any municipality, including the right of eminent domain."

This is one section of our statute (ch. 3, art. 1, 1947 Supp.) pertaining to municipal airports and fields. It authorizes the governing body of the city to acquire an airfield "within or without the city limits" by purchase, lease, or otherwise, and to equip, improve, operate and maintain such an airfield, and by section 3-118 a city of the first class may acquire an additional airport "within or without the city limits." Other sections provide for joint ownership of an airport by a city and county, or by two or more municipalities. We see nothing in any provision of the statute in question which brings within the corporate limits of a city an airport which it has acquired and which is situated outside of the corporate limits of the city. This contention of defendant appears to be an afterthought. Certainly at the time the ordinance in question was adopted by the city the 925 acres of the airport were not regarded as being or within the corporate limits of the city. Had it been so considered there would have been no purpose of including it within the ordinance.

Defendant argues that a declaratory judgment is not proper to be considered in this case. That point is well taken. The points upon which plaintiff seeks a declaratory judgment are interpretations of statutes or other legal principles as they apply to this ordinance in question. Similar questions are presented in practically every case and do not call for invoking the provisions of our declaratory judgment statutes (G. S. 1935, 60-3127 to 60-3132).

Lastly, defendant argues that its motion for judgment on findings of fact should be sustained; that exceptions of defendant to certain

findings and conclusions are well taken, and that defendant's request for further findings are well taken. These contentions require an examination of all the testimony and exhibits and the argument of counsel thereon. We have taken the time to read the transcript of testimony, examine all the exhibits, and have considered all of the arguments of counsel. To restate our findings and conclusions thereon would be to state what our commissioner has already done, perhaps in somewhat different phraseology. It is sufficient to say that we are satisfied with the findings of fact and conclusions of law made by our commissioner and approve the same in every respect except in one minor detail, namely the last sentence of conclusion of law No. 6, which reads:

"A stronger case for annexation of the entire Fairfax Industrial area to the city of Kansas City could hardly be made out under the general annexation statute, Art. 5, Chapter 12, General Statutes of 1935."

We delete that for two reasons: *First,* our decision must be limited to the authority of the city to pass the ordinance in question, which described only a portion of "the entire Fairfax Industrial area." *Second,* the statute referred to by our commissioner (G. S. 1935, 12-501 to 12-502b) outlines an entirely different procedure from that followed by defendant in this case. We prefer to decide questions pertaining to the annexation of the entire Fairfax industrial area under the statute referred to if and when such a case is presented to us.

By leave of court counsel for Quindaro township, in which the Fairfax Industrial District is situated, filed a brief *amici curiae* in support of plaintiff's petition for quo warranto, upon the ground that if the ordinance in question is sustained the township will lose a substantial amount of taxes needed for the maintenance of township roads and other purposes. Under similar procedure counsel for the four rural high schools of Wyandotte county filed a similar brief upon the ground that the schools would lose money now raised by taxes upon the property the Fairfax Industrial District needed for the maintenance of the schools. In that part of the Fairfax Industrial District south and east of the property described in Ordinance No. 35,841 and in that part of the district to the west of such property there are situated a number of valuable industrial properties, while in the area described by the ordinance there is but a small part of privately owned property subject to taxation. In computing their loss of taxes counsel in both briefs

computed the taxes as now collected from all of the privately owned property in the Fairfax Industrial District. If any taxes should be considered here it should be only that portion collected from the privately owned property situated within the boundaries of the ordinance in question. Passing that thought, the statute (G. S. 1935, 13-1602), under which defendent proceeded, makes no specific reference to further consideration of taxes which might be assessed and collected by townships and school districts upon property which may be added to a city. The statute does require the governing body of the city, before it approved the ordinance, to notify the county clerk and the county superintendent in writing at least ten days before approval of the ordinance. Our commissioner found that was done. That provision of the statute was intended to give the county clerk and the county superintendent an opportunity to present to the governing body of the city any information they thought proper and any objections they desired to make because of the effect the ordinance would have upon local taxing districts. These are matters which go to the prudence and advisability of the approval of the ordinance of the governing body of the city. In addition to these reasons it may be said to be fundamental that the enlargement of the boundaries of the city will have some effect upon taxes of the township and of school districts, and possibly on the local governmental divisions, and the law appears to be well settled that, except as knowledge and consideration of those matters should be considered by the governing body of the city in determining whether the ordinance should be approved, they do not constitute legal objections to the annexation. That changes of boundaries may result in changes in burdens of taxation does not make the proceeding one for taking private property of the inhabitants. The proceeding is not one for the direct imposition of taxes, but is political; the matter of taxes is merely an incident that follows, as it is in much that is done legislatively.

Counsel for plaintiff and counsel *amici curiae* criticize defendant for having proceeded "ex parte" under G. S. 1935, 13-1602. The criticism is not justified. To the extent this statute authorized an *ex parte* procedure it is sufficient to say the legislature provided it.

It is well settled that the creation of municipal corporations and the fixing or modification of their boundaries are legislative functions to be performed by the legislative branch of the government. In the absence of a constitutional provision limiting the authority

of the legislature in that respect the legislature has the authority to create municipal corporations, modify their boundaries by increasing or decreasing them, or disorganize the municipalities, as the legislature may deem beneficial. Where there are constitutional limitations upon the legislature in those respects those limitations must be complied with.

The pertinent portions of our constitution (art. 12, § 1) read: "The legislature shall pass no special act conferring corporate powers. . . ." and § 5: "Provision shall be made by general law for the organization of cities, towns and villages." Early in the history of our state it was held that these provisions of our constitution apply to municipal corporations. (See, *Atchison v. Bartholow*, 4 Kan. 124, 141 to 148; *City of Wyandotte v. Wood*, 5 Kan. 603.) These decisions have been followed.

G. S. 1935, 13-1601 in part reads:

"The corporate limits of any city shall remain as they now are and until changed by ordinance, as herein provided. . . ."

A section tantamount to this pertaining to cities of the first class has been in our statutes since 1868. (See ch. 18, sec. 3, Gen. Stat. 1868.) So, in order to extend its boundaries the defendant city had to find authority in the statutes. It seeks to justify the ordinance here in question by the next succeeding section of the statute (13-1602).

The evidence and the report of our commissioner have taken a wide range and much more might be written. But when we limit our decision, as we must, to the validity of Ordinance No. 35,841, we think it clear that the defendant city had no authority under our statute (G. S. 1935, 13-1602) to enact the ordinance.

The result is judgment must be rendered for plaintiff that the ordinance is invalid.

It is so ordered.